(No. 40639.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.* CHARLES WRIGHT *et al.*, Appellants.

*Opinion filed November 22, 1968.*

WARD, J., took no part.

GETER & GETER, of Chicago, (HOWARD D. GETER, SR. and HOWARD D. GETER, JR., of counsel,) for appellants.

WILLIAM G. CLARK, Attorney General, of Springfield, and JOHN J. STAMOS, State's Attorney, of Chicago, (FRED G. LEACH, Assistant Attorney General, and ELMER C. KISSANE and SHELDON M. SCHAPIRO, Assistant State's Attorneys, of counsel, ) for the People.

Mr. JUSTICE UNDERWOOD delivered the opinion of the court:

On May 12, 1966, the defendants were found guilty of gambling after a bench trial in the Cook County circuit court. The sentences imposed ranged from 3 months imprisonment and a $300 fine to one year's probation and a $100 fine. Defendants contend the evidence introduced against them in the trial court was illegally seized by police officers who, without consent or a valid search warrant, entered a private dwelling for the purpose of making an arrest.

The sole witness at defendants' trial was arresting officer Herman Waller, a Chicago policeman with 4 years experience, who testified he had made approximately 300 previous "policy" (a numbers game) arrests. On Novem-

ber 24, 1965, Waller secured a search warrant for the second floor apartment of a two-story frame building at 1702 North Bissell in Chicago. He and four other officers arrived outside the premises at about 9:30 P.M. and established a surveillance of the building because they were informed that the individuals involved in a policy operation there would not be in the second floor apartment until 10:00 or 10:30 P.M. During the surveillance Officer Waller observed persons who were allegedly engaged in the policy operation entering the first floor apartment rather than the second floor apartment. The officer testified that he recognized some of these people as "known policy runners" whom he had arrested many times before, and after some 35 minutes spent in watching the front of the apartment building he proceeded to the rear of the premises to look into a window of the first floor apartment which was partially covered by curtains. Since the building did not have a back yard the officer was able to stand 1 to 3 feet from the rear window under the elevated tracks on the Chicago Transit Authority right-of-way. Through a crack in the window curtain Officer Waller testified that he could see the heads of the people inside, and through the closed window he could hear an adding machine being operated and a female voice inquiring: "Are all your books in? Who has any short books? Where is all the money?" From his extensive experience with policy gambling operations the officer knew that adding machines were commonly used to add up the sums of money collected, and he also knew that a "short book" referred to a situation where a runner does not have enough money to "clear" his bets on a particular book. After about ten minutes of watching and listening through this window, Officer Waller went to the front door of the apartment, knocked, announced his office, and forced his way in after the person coming to the door told him to "get lost." The officer then went directly to the kitchen in the rear of the apartment where he observed defendants

Estele Johnson, Francis Spires and a third defendant who is not a party to this appeal sitting at a table with an adding machine, policy writings and policy result slips thereon. Another defendant, Charles Wright, yelled "Police" and threw a bag containing $179.35 behind a washing machine. Defendants Rufus Hooks and Jimmy Carter were also in the kitchen and a search of them revealed they were carrying policy writings and money in their pockets. At this time Officer Waller testified defendants Wright, Carter and Hooks made various incriminating remarks to him. Defendant Wright asked him, "Well, why don't you go out and leave this policy alone." Defendant Clark stated, "Okay, you got me, let's go", and defendant Hooks remarked, "Well, you have finally got me."

The single question presented by the facts of this case is whether the trial court was correct in refusing to suppress the evidence thus secured, and resolution of this question depends upon whether the defendant's fourth amendment rights against unreasonable searches and seizures were violated. It is of no consequence that the search warrant obtained by police was quashed because it authorized a search only of the second floor apartment of the two-story building, since defects in a search warrant are immaterial if the search can be otherwise justified. (*People* v. *Washington, ante.* p. 16; *People* v. *Williams,* 36 Ill.2d 505, 509; *People* v. *Brinn,* 32 Ill.2d 232, 241.) The test of the constitutionality of a search "is not whether it was reasonable or practicable for the officers to obtain a search warrant, but whether the search was unreasonable. It is well established that a search without a warrant is reasonable and valid if it is incident to a lawful arrest and there is no requirement that the arrest be under the authority of an arrest warrant. (*Ker* v. *California,* 374 U.S. 23, 41, 83 S. Ct. 1623, 10 L. ed. 2d 726.) In turn, the validity of an arrest without a warrant depends upon whether the officers had reasonable cause to believe that an

offense had been committed and that the defendant had committed it. (*People* v. *Jones,* 16 Ill.2d 569, 573.) The test is not whether there is sufficient evidence to convict the arrested person, but probable cause exists for arrest where a reasonable and prudent man, having the knowledge possessed by the officer at the time of the arrest, would believe the defendant committed the offense. (*People* v. *Hightower,* 20 Ill.2d 361, 366.) In deciding the question in a particular case, courts deal with probabilities and are not disposed to be unduly technical. (*People* v. *Fiorito,* 19 Ill.2d 246, 256.)" *People* v. *Jones,* 31 Ill.2d 240, 243-4.

In *Davis* v. *United States* (9th cir.), 327 F.2d 301, 305, the rule is stated that " 'It is well established that it is not a search to observe what is open and patent either in daylight or in artificial light. United States v. Lee, 274 U.S. 559, 47 S. Ct. 746, 71 L. Ed. 1202; Boyd v. United States, 4 Cir., 286 F. 930; Smith v. United States, 4 Cir., 2 F.2d 715; Safarik v. United States, 8 Cir., 62 F.2d 892, 895 * * *.' Petteway v. United States, 261 F.2d 53, 54 (4th Cir. 1958). As was said by Judge Holtzoff in United States v. McDaniel, 154 F. Supp. 1, 2 (D.C. 1957), affirmed 255 F.2d 896 (D.C. Cir., 1958) and cert. denied, 358 U.S. 853, 79 S. Ct. 82, 3 L. Ed. 2d 87 (1958), Williams v. United States, 363 U.S. 849, 80 S. Ct. 626, 4 L. Ed. 2d 1732 (1960), 'if, without a search and without an unlawful entry into the premises, a contraband article * * * is seen in the premises, the police are not required to close their eyes and need not walk out and leave the article where they saw it.' " (See *People* v. *Tate,* 38 Ill.2d 184, 187; *State* v. *Carpenter,* 181 Neb. 639, 150 N.W.2d 129, 134-5.) This plain view doctrine has been applied to anything which an officer becomes aware of by use of his five senses while in a lawful position. *Walker* v. *State* (Okl. Cr.), 270 P.2d 1107; see also *United States* v. *Shue* (4th cir.), 385 F.2d 416.

As recently as *Harris* v. *United States,* 390 U.S. 234,

19 L. Ed. 2d 1067, 88 S. Ct. 992, 993, the United States Supreme Court reaffirmed the principle that "objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence. Ker v. State of California, 374 U.S. 23, 42-43, 83 S. Ct. 1623, 1634, 1635, 10 L. Ed. 2d 726 (1963); United States v. Lee, 274 U.S. 559, 47 S. Ct. 746, 71 L. Ed. 1202 (1927); Hester v. United States, 265 U.S. 57, 44 S. Ct. 445, 68 L. Ed. 898 (1924)." However, in *Katz* v. *United States,* 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507, a pre-*Harris* decision, the Supreme Court held that use of an electronic eavesdropping device to overhear one side of a telephone conversation in a public telephone booth was an unconstitutional search and seizure regardless of the fact that the device employed did not happen to penetrate the wall of the booth. The court there noted that the underpinnings of the "trespass" doctrine had been so eroded that it could no longer be regarded as controlling. We do not, however, read *Katz* as indicating any constitutional infirmity in the instant search, for we believe the seemingly restrictive ruling in *Katz* is applicable only to those instances where electronic eavesdropping devices or other artificial means are employed in addition to the natural senses. We read the reaffirmation of the lawful position aspect of the plain-view doctrine in *Harris* as retaining the viability of the trespass doctrine in those cases where law enforcement officers gain information concerning crimes by use of their natural senses. Therefore, while the absence of a trespass is no longer to be an adequate ground to justify the admission of evidence secured through use of the natural senses assisted by artificial means, the lack of a trespass is still a highly relevant consideration in sustaining the admission of evidence which has fallen into the plain view of an officer, *i.e.,* gathered solely by the use of his natural senses.

We have here a law enforcement officer using his senses

of vision and hearing to discover what is occurring inside a private residence. In three Federal cases (*Brock* v. *United States* (5th cir.), 223 F.2d 681; *California* v. *Hurst* (9th cir.), 325 F.2d 891; *Texas* v. *Gonzales* (5th cir.), 388 F.2d 145) it was held that evidence procured by officers standing on the *defendants' premises* and peering into their windows constituted a search in violation of the defendants' fourth amendment "right to be let alone." This case differs from those on the physical facts because here the police officer watched and listened through the rear window of the first floor apartment while standing on public property, a C.T.A. right-of-way where he had a right to be, rather than trespassing on defendants' property; and the absence of a trespass under our reading of *Harris* is of major if not decisive importance in cases involving the plain-view doctrine. We need not make the resolution of this appeal turn on the absence of a trespass by Officer Waller, however, because the *Brock-Hurst-Gonzales* cases do not hold that officers can never acquire probable cause to arrest by looking in windows of private residences, "but only that they must have probable cause to think that a crime is being committed before they do so." (388 F.2d at 148.) It is clear that when Officer Waller peered through the rear window in question, he had ample cause to believe that a policy operation was being conducted on the premises. The officer knew that by issuing a search warrant for the second floor apartment of the two-story structure at 1702 North Bissell a court had found there was sufficient cause to believe that a policy operation was being carried on in the building. Furthermore, he had been informed that those individuals involved in the gambling activity would not arrive at the apartment until 10:00 or 10:30 P.M., and when he observed persons known to him as policy runners whom he had arrested on many prior occasions enter the first floor apartment at about 10 o'clock that evening we hold that he had probable cause to believe that the policy

operation was being conducted in that apartment on that particular night. (See *Davis* v. *State,* 166 Tex. Cr. 480, 316 S.W.2d 745.) Therefore the evidence which was seized incident to the arrest of the defendants was properly admitted.

The judgment of the Cook County circuit court is accordingly affirmed.

*Judgment affirmed.*

Mr. Justice Ward took no part in the consideration or decision of this case.